**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-09-536-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael Dean West, | |
| Defendant. | |

Defendant Michael Dean West has been charged with unlawful possession of stolen mail in violation of 18 U.S.C. § 1708. Dkt. #10. Defendant has filed a Motion to Suppress Evidence. Dkt. #16. Defendant argues that Phoenix police officers violated his Fourth Amendment rights by seizing him without reasonable suspicion when they questioned him on a sidewalk and by searching a duffel bag in his possession. Defendant asks the Court to suppress all evidence resulting from these alleged constitutional violations, including the allegedly stolen mail found in the duffel bag.

**I.     Factual Background.**

At a hearing on July 23, 2009, the Court heard testimony from Officers Nicks and Thomas of the Phoenix Police Department. The Court found the arrest account provided by the officers to be credible and bases the following factual description on their testimony.

At about 1:10 p.m. on April 6, 2009, Officers Nicks and Thomas observed Mr. West near the intersection of 13th and Peoria Avenues in the Sunnyslope area of Phoenix, Arizona. The area is known by the officers to be a high-crime area prone to burglaries and thefts.

1 Officers Nicks and Thomas were driving a marked Chevrolet Tahoe eastbound on Peoria approaching 13th Avenue. The officers initially observed Mr. West when he was approximately one-half block east of 13th Avenue, riding his bicycle westbound on the sidewalk along the south side of Peoria. Mr. West was wearing jeans, a light-colored t-shirt, tan boots, and dark gloves. He had a blue duffel bag on the back of the bicycle.

The officers pulled their marked car to the side of the road just east of 13th Avenue, stopping next to the sidewalk as Mr. West approached. Officer Thomas, who was on the passenger side of the vehicle and closest to Mr. West, called to Mr. West out of the vehicle window. He asked how Mr. West was doing and if he would speak to them for a moment. Mr. West stopped his bike and said he had not done anything wrong. Officer Thomas agreed and said they were merely talking to people in the area. Mr. West agreed to speak. The officers did not activate the Tahoe's overhead lights or siren, and both officers remained in the vehicle while conversing with Mr. West, who stood on the sidewalk straddling his bicycle.

The officers asked Mr. West where he lived and where he was going. Mr. West said he lived near 15th Avenue and Peoria and was going to Central Avenue and Mountain View to help a friend move. Because Mr. West would not provide a precise location for his residence and because the friend's house was in the opposite direction from Mr. West's direction of travel, the officers found his answers suspicious and asked to see his identification. The officers also found it suspicious that Mr. West was wearing dark work gloves on a warm day. When they asked him about the gloves, he said he wore them because the handlebar grips on the bike made his hands dirty, an answer the officers found curious due to Mr. West's generally dirty and unkempt appearance. Mr. West agreed to provide them with identification and turned to reach into a zippered compartment of the duffel bag on the back of the bike. Seeing Mr. West reach into the bag, and being concerned for officer safety because he did not know what was in the bag, Officer Nicks exited the vehicle from the driver's door and stood eight to ten feet from Mr. West as he retrieved his identification. Mr. West handed the identification to Officer Nicks who in turn handed it to Officer Thomas.

1         Officer Thomas ran a computer check on the identification and found an outstanding City of Phoenix warrant for Mr. West's arrest. When Officer Thomas disclosed the warrant, Officer Nicks asked Mr. West to get off his bike and sit on the curb while Officer Thomas verified the warrant. Officer Nicks asked Mr. West what was in the duffle bag. Mr. West replied that it contained tools.

        Officer Thomas' phone call to police headquarters confirmed that the arrest warrant was active. Officer Thomas then exited the vehicle, and the officers explained to Mr. West that there was a warrant for his arrest with a $300 bond. They offered to drive him to jail where he could post the bond and be released. When Mr. West stated that he did not have $300 but could borrow it from a friend, the officers offered to drive him to the friend's house to borrow the money on the way to the jail. Mr. West agreed.

        Another Phoenix police officer in the area heard over the radio that a warrant suspect had been detained and drove to the scene to provide back-up. He pulled his patrol car behind the Tahoe. While Officer Nicks patted down Mr. West for purposes of officer safety, Officer Thomas removed the duffel bag from the back of the bike, placed the bag on the sidewalk, and attempted to load the bike in the Tahoe. When the bike would not fit easily, Officer Thomas took the bike to the back of the patrol car to place it in the trunk. Officer Nicks took Mr. West around to the driver's side of the Tahoe to place him in the back seat of the vehicle. Police department policy requires that suspects being transported by police be handcuffed. When Officer Nicks began to handcuff Mr. West, he fled. All three officers gave chase and apprehended Mr. West when he slipped and fell on some gravel one-half block south of Peoria. As he was caught and being handcuffed, Mr. West apologized for fleeing and said that the duffel bag was not his and that he did not know anything about the documents inside.

        The officers returned Mr. West to the patrol vehicles and placed him in the back seat of the Tahoe at approximately 1:20 p.m. They loaded the duffel bag – which had remained on the sidewalk during the chase – into the Tahoe. They were also able to fit the bike in the Tahoe by opening a rear window.

In light of Mr. West's flight, the officers no longer were willing to help him post bail. They asked whether he would prefer to leave the bike somewhere or have it impounded at the jail. Mr. West said the bike was borrowed and asked them to leave it at his friend's house. The officers drove Mr. West to the friend's house near Central and Mountain View. When no one answered the door, the officers placed the bike in the carport. Officer Thomas then asked Mr. West what he wished to take to jail from the duffel bag. Mr. West said he did not recall what was in the bag. Officer Thomas placed the bag on the back of a parked car and opened it. Inside he found mail from various addresses not belonging to Mr. West, several credit and debit cards that did not belong to Mr. West, and two personal checks that appeared to have been altered.

The officers took Mr. West to Desert Horizon Precinct where Postal Investigator Wilson continued the investigation. During an interview with Investigator Wilson, Mr. West again denied ownership of the duffel bag. Defendant was charged with possession of the stolen mail contained in the bag.

**II.     The Encounter Between Mr. West and the Police Officers Was Consensual.**

Defendant argues that his encounter with Officers Nicks and Thomas was, from the outset, an investigatory stop that amounted to a seizure under the Fourth Amendment. *See* Dkt. ##16, 20. Mr. West contends that the seizure was unlawful because the officers did not have reasonable suspicion to stop him. *Id.*

"For purposes of the Fourth Amendment, a seizure occurs when an officer, through some form of physical force or show of authority, restrains the liberty of a citizen." *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001) (citations omitted). Such restraint occurs if, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (citations omitted). While officers need reasonable suspicion of criminal activity to justify a Fourth Amendment seizure, no such justification

is necessary for a consensual encounter. *Summers*, 268 F.3d at 686. "When an encounter is voluntary, no constitutionally protected right is implicated." *Id*.

The officers initiated the encounter with Mr. West by stopping their patrol vehicle by the side of a public street, parallel to Mr. West's path of travel. The Tahoe's position did not impede Mr. West's travel on the sidewalk, nor did the officers order Mr. West to stop either verbally or by signaling with the Tahoe's siren and overhead lights. The officers asked to have a word with Mr. West and confirmed that he had not done anything wrong, stating that they were merely talking to people in the area. The officers remained in their vehicle with their weapons holstered while questioning Mr. West. The officers asked to see Mr. West's identification. Only when Mr. West reached into the duffel bag to retrieve his identification did Officer Nicks exit the vehicle to stand some distance away on the sidewalk.

These actions are not consistent with the show of physical force or authority necessary to constitute a Fourth Amendment seizure. They would not "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Brown*, 563 F.3d at 415 (citations omitted).

The officers asked questions of Mr. West, but it is well settled that police questioning of willing individuals in a public place does not constitute a Fourth Amendment seizure. *United States v. Turvin*, 517 F.3d 1097, 1100 (9th Cir. 2008); *see also INS v. Delgado*, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). The officer also asked to see Mr. West's identification, but this does not convert an otherwise consensual encounter into a seizure. *See Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006) (citing *Delgado*, 466 U.S. at 216); *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 185 (2004).

Mr. West was not seized for purposes of the Fourth Amendment until Officer Nicks asked him to dismount from the bike and sit on the curb. By that time the officers had discovered the outstanding arrest warrant, sufficient legal grounds to detain – indeed, to

1 arrest – Mr. West. The encounter between Mr. West and the officers was never an unlawful seizure in violation of the Fourth Amendment.

### III. Warrantless Search of the Duffel Bag Does Not Require Suppression.

Defendant asks this Court to suppress evidence discovered during the search of the duffel bag. Mr. West argues that "[he] was unlawfully stopped and no warrant exception applies to the subsequent search of the duffel bag," asserting specifically that the search does not qualify as a search incident to a lawful arrest. Dkt. #16 at 3-4. As explained above, the encounter between police and Mr. West was lawful and so cannot itself taint the evidence discovered in the search. Evidence from the duffle bag will be suppressed, therefore, only if the search of the bag was an invalid warrantless search.

#### A. Mr. West Abandoned Any Expectation of Privacy in the Bag.

"There can be nothing unlawful in the Government's appropriation of . . . abandoned property." *Abel v. United States*, 362 U.S. 217, 241 (1960). Voluntary abandonment of property forfeits an individual's reasonable expectation of privacy in the abandoned item. A subsequent search of the item therefore does not violate the Fourth Amendment. *See id.* at 240-41; *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976).

Abandonment is a question of intent and can be inferred from words, acts, and other objective facts indicating the relinquishment of a reasonable expectation of privacy. *Jackson*, 544 F.2d at 409. The touchstones for finding abandonment are deliberate physical relinquishment and denial of ownership. *See, e.g., United States v. Decoud*, 456 F.3d 996, 1007-08 (9th Cir. 2006) (abandonment due to denial of ownership); *United States v. Nordling*, 804 F.2d 1466, 1469-70 (9th Cir. 1986) (abandonment due to denial of ownership and deliberate physical relinquishment); *United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir. 1981) (abandonment due to denial of ownership). Both occurred here.

Mr. West relinquished physical control of the duffel bag when he fled from the police, leaving the bag on the sidewalk beside the Tahoe. While there is no reason to believe Mr. West would have left the bag but for his impending arrest, he had the option to remain in custody with the duffel bag, thereby not abandoning a privacy interest in the bag. *See*

*Veatch*, 674 F.2d at 1221 n.5 ("Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary.") (citing *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc)).

When apprehended by the officers after his brief flight, Mr. West volunteered that the duffel bag did not belong to him. Such an express "denial of ownership when questioned, even if the defendant is seen previously in possession of the item," is itself sufficient to indicate abandonment. *United States v. Cella,* 568 F.2d 1266, 1283 (9th Cir. 1977) (citing *Jackson*, 544 F.2d at 409, 411).

Mr. West clearly and voluntarily "gave up any expectation of privacy in the [duffel bag] by unequivocally disclaiming ownership" and relinquishing possession of the bag. *Decoud*, 456 F.3d at 1007 (citations omitted). Because Mr. West thereafter had no reasonable expectation of privacy in the bag, the search did not violate his Fourth Amendment rights.[1]

### B. The Contents of the Bag Would Inevitably Have Been Discovered.

Even if the duffel bag had not been abandoned, the evidence found during the search of the bag would still be admissible under the inevitable discovery exception to the exclusionary rule. Under this doctrine, evidence obtained in violation of the Fourth Amendment is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Such lawful means include routine police procedures such as an inventory search of items seized during an arrest. *United States v. Ankeny*, 502 F.3d 829, 835 n.2 (9th Cir. 2007); *United States v. Mancera-Londono*,

---

[1] In his reply memorandum, Defendant argues that the search is invalid despite indicia of abandonment because the abandonment resulted from his prior unlawful seizure. Dkt. #20 at 1. It is true that "[a]n abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary." *United States v. Stephens*, 206 F.3d 914, 917 (citations omitted); *see also Jackson*, 544 F.2d at 409 (same). As already noted, however, the encounter between Mr. West and the police officers was consensual, not unlawful. The abandonment did not result from an unlawful seizure.

912 F.2d 373 (9th Cir. 1990); *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986); *United States v. Wiga*, 662 F.2d 1325, 1333 n.9 (9th Cir. 1981).

Written policies of the Phoenix Police Department require a full inventory search of personal property taken into custody with an arrested person. Def. Ex. #15, Phoenix Police Department Operations Order 4.11 ¶10. The policy applies to "all personal effects" and "all containers." Def. Ex. #15 ¶10(B)(1)-(2); *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) (holding that it is not unreasonable to search all containers and possessions as part of routine inventory procedures). The purpose of the inventory search is not to find evidence, but to "protect the owner's property while it remains in police custody, to protect the officers against claims or disputes over lost o[r] stolen property, and to protect the officer and others from potential danger." Def. Ex. #15 ¶10(A). These are legitimate purposes of an inventory search. *See Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

Mr. West was arrested pursuant to an outstanding City of Phoenix warrant, the validity of which has not been challenged. While the officers left the bicycle at Mr. West's friend's house, the officers testified that they never intended to leave the duffel bag with the bike. The duffel bag was to accompany Mr. West to jail, where routine procedures required an inventory search before Mr. West was booked. Def. Ex. #15 ¶10(B)(2). The contents of the bag would inevitably have been discovered, and therefore are admissible under the inevitable discovery doctrine even if no abandonment occurred.

**IT IS ORDERED** that Defendants' Motion to Suppress (Dkt. #16) is **denied**. Excludable delay pursuant to 18 U.S.C. § 3161(h)(8)(A) is found to commence on June 4, 2009 for a total of 56 days.

DATED this 29th day of July, 2009.

David G. Campbell
United States District Judge